# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 13-CV-2479 (PKC) (RER)

---

GLOBAL AUTO, INC., *ET AL*,

Plaintiffs,

VERSUS

MICHAEL HITRINOV, A/K/A/ MICHAEL KHITRINOV, *ET AL.,*

Defendants.

---

№ 14-CV-2566 (PKC) (RER)

---

EMPIRE UNITED LINES CO., INC., *ET AL*,

Plaintiffs,

VERSUS

SK IMPORTS, INC., *ET AL*,

Defendants.

---

**REPORT & RECOMMENDATION**

August 20, 2021

---

**TO THE HONORABLE JUDGE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE**

**RAMON E. REYES, JR., U.S.M.J.:**

Before the Court are two motions for default judgment in these related cases. In *Global Auto, Inc. v. Hitrinov*, No. 13-CV-2479 (PKC) (RER), Empire United Lines Co. ("EUL" or

1

"Empire") and its principal, Michael Hitrinov ("Hitrinov") (collectively "the EUL Parties") seek default judgment on their breach of contract and libel counterclaims against Global Auto, Inc. ("Global"), G Auto Sales, Inc. ("G Auto"), and Effect Auto Sales, Inc. ("Effect Auto") (collectively, "the Global Corporations"). (Dkt. Nos. 133-138). In *Empire United Lines Co., et al. v. SK Imports, Inc. et al.*, No. 14-CV-2566 (PKC) (RER), the EUL Parties seek default judgment on those same claims asserted as plaintiffs, not counterclaimants, against the Global Corporations and Sergey Kapustin ("Kapustin") (collectively "the Global Parties"), and Irina Kapustina ("Kapustina") and Michael Goloverya ("Goloverya"). (Dkt. Nos. 48-53).[1] For the reasons set forth herein, I respectfully recommend that the motions be granted in part and that judgment for $2,436,050 be entered against the Global Parties on the EUL Parties' libel per se claims, and that all other claims be dismissed.[2]

## **BACKGROUND**

As Your Honor is familiar with the factual background and procedural histories of these cases, I will dispense with a protracted discussion of each. *See Global Auto v. Hitrinov*, Nos. 13-CV-2479 (PKC)(RER), 14-CV-2566 (PKC)(RER), 2021 WL 1220712 (E.D.N.Y. Mar. 31, 2021).[3] The following is provided only to aid the reader in understanding the motions at issue.

---

[1] Because the EUL Parties' counterclaims and claims in the two actions are identical, I will refer to them collectively as "claims." In their motions, the EUL Parties have withdrawn their claims for common law fraud and tortious interference with contract. (Case No. 14-CV-2566, Dkt. No. 49 ("Default Judgment Mem.") at 16). Further, all claims against Kapustina and Goloverya were settled and have been dismissed with prejudice. (Order dated 1/31/2020, Case No. 14-CV-2566).

[2] Lauren Brady, a rising second-year student at Brooklyn Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Report and Recommendation.

[3] *See also Global Auto v. Hitrinov*, Nos. 13-cv-2479 (SLT) (RER), 14-CV-2566 (SLT)(RER), 2015 WL 5793383 (E.D.N.Y. Sep. 30, 2015) (dismissing Global Auto's claims without prejudice and denying EUL's motion for preliminary injunction); *Global Auto v. Hitrinov*, Nos. 13-CV-2479 (SLT)(RER), 14-CV-2566 (SLT)(RER), 2015 WL 7430001 (E.D.N.Y. Nov. 19, 2015) (denying reconsideration of EUL's motion for preliminary injunction).

The Global Corporations, which no longer exist, consisted of several related New Jersey and Pennsylvania corporations that sold vehicles online to customers overseas. (Case No. 13-CV-2479, Dkt. No. 47 ("Global Am. Compl.") ¶ 2; Case No. 13-CV-2479, Dkt. No. 51 ("EUL Countercl.") ¶¶ 28–29; Case No. 14-CV-2566, Dkt No. 1 ("EUL Compl.") ¶¶ 6; 44; 52). Kapustin was the President of Global Auto and allegedly one of the alter egos of the Global Corporations. (EUL Compl. ¶¶ 6, 43–59). In September 2010, the Global Parties, acting through Kapustin and Kapustina, contacted Hitrinov, the President of EUL (*id*. ¶ 4), a global shipping business, to inquire whether the EUL Parties wanted to invest in the Global Parties' car export business. (*Id*. ¶ 12). In exchange for the investment, the EUL Parties would receive sixty percent of the profits from sold vehicles. (*Id*.) Further, 1.5% of the amount invested was to be paid per month "as an advance payment of Empire's share of anticipated profits,", and then the remainder in the year after the vehicles were sold. (*Id*. ¶¶ 12-18). As part of the agreement, EUL would also store the vehicles in its New Jersey warehouse and transport them to Europe. (*See id*. ¶¶ 20, 28–30, 79).

By December 2011, Empire had invested a total of $450,120 in the Global Corporations. (*Id*. ¶ 19). Additionally, between March 2010 through December 2012, EUL shipped cars between the United States and Europe for the Global Corporations. (Global Am. Compl. ¶¶ 2; 64). Sometime thereafter, the parties' business relationship began to deteriorate. The EUL parties allege that they were not paid their share of the profits from the sold vehicles. (*Id*. ¶¶ 20-21). At the end of 2012, Empire demanded that the Global Parties repay Empire's investment in full within thirty days. (*Id*. ¶ 26). On December 18, 2012, Empire also notified the Global Parties that it would begin charging handling and storage fees for the vehicles (*Id*. ¶ 28).

After this, the Global Parties demanded the release of the vehicles stored in EUL's New Jersey warehouse. The EUL parties refused to release the cars without first being paid their sixty

percent equity interest in the vehicles and the newly imposed storage charges (EUL Compl. ¶¶ 17-18, 28). EUL also seized the vehicles in its possession at its warehouses and sold them in partial satisfaction of the debt owed to it by Global. (EUL Countercl. ¶ 28). The Global Parties subsequently filed the first lawsuit for, *inter alia*, the release of the cars. (*See generally* Global Am. Compl.)

After EUL seized the vehicles, Global allegedly created "sham Internet attack websites" designed "to damage [EUL's] and Hitrinov's commercial and personal reputation." (EUL Compl. ¶ 31; EUL Countercl. ¶¶ 59–74). These websites described Hitrinov as "the most ingenious crook of all time," a "racketeer," and a "large-scale money-launderer" and stated that EUL is a "scam" and "rouge enterprise." (*See* EUL Compl. ¶¶ 104; Case No. 13-CV-2479, Dkt. Nos. 138-18). In February and March 2013, the Global Parties also allegedly sent e-mails to known EUL clients containing additional falsehoods about the EUL Parties. (EUL Compl. ¶¶ 32-34). The EUL Parties allege that these statements caused Hitrinov's reputation to be "seriously injured" and caused monetary damages. (EUL Compl. ¶ 112).

On April 24, 2013, the Global Corporations filed suit against, *inter alia*, Empire for breach of a maritime shipping contract, tort claims, and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961 *et seq*. (Case No. 13-CV-2479, Dkt. No. 1). On February 7, 2014, the Global parties filed an Amended Complaint. (Case No. 13-CV-2479 Dkt. No. 47 ("Global Auto Am. Compl.")). Later that month, Empire filed counterclaims against the Global Parties. (EUL Countercl.) On April 23, 2014, the EUL Parties filed their own suit against, *inter alia*, SK Imports d/b/a Global Cars, Kapustin, Irina Kapustina ("Kapustina"), and Michael Goloverya ("Goloverya"). (*See* EUL Compl.). Shortly thereafter, the cases were consolidated, and *Global Auto* was designated as the lead case. (Order dated 5/19/2014). On May 28, 2014 Kapustin,

4

Kapustina, and Goloverya were properly served with the EUL Complaint. (Case No. 14-CV-2566, Dkt. Nos. 6–8). Default was entered against the Global Corporations on October 2, 2015. (Case No. 14-CV-2566, Dkt. No. 16). Plaintiffs then filed their motion for default judgment on January 29, 2020. (Dkt. No. 133). Your Honor referred the motion to me on January 31, 2020. (Order dated 1/31/2020).

## DISCUSSION

I.   Default Judgment Standard

Rule 55 of the Federal Rules of Civil Procedure governs motions for default judgment. *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005). The Rule sets forth a two-part process to determine whether the motion should be granted. First, the plaintiff must obtain a certificate of default from the clerk of the court. FED. R. CIV. P. 55(a). This first step is nondiscretionary. *United States v. Conolly*, 694 F. App'x 10, 12 (2d Cir. 2017). At the request of the plaintiff, "the clerk must" issue a certificate of default when the "party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" the action, "and that failure is shown by affidavit or otherwise." FED. R. CIV. P. 55(a); *Green*, 420 F.3d at 104. Second, after the certificate of default is issued, the plaintiff "must apply to the court for a default judgment." FED. R. CIV. P. 55(b)(2). "Default judgments are 'generally disfavored and are reserved for rare occasions.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)).

A default serves as the defendant's admission that the complaint's well-pleaded factual allegations are true. *Masino v. Architectural Pavers Corp.*, No. 09-CV-2213 (DLI) (RER), 2009 U.S. Dist. LEXIS 126462, at *4 (E.D.N.Y. Dec. 2, 2009), *R & R adopted by* 2010 U.S. Dist. LEXIS 32502 (Jan. 15, 2010); *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (after default the

"court is required to accept all of the [plaintiff's] [well-pleaded] allegations as true and draw all reasonable inferences in its favor."). A fact is not considered "well-pleaded," however, "if it is inconsistent with [the] other allegations of the complaint or with facts of which the court can take judicial notice." *Hop Hing Produces Inc. v. Lin Zhang Trading Co, Inc.*, No. 11–CV–03259 (NGG) (RLM), 2013 WL 3990761, at *3 (E.D.N.Y. Aug. 5, 2013) (internal quotation marks omitted). Ultimately, whether to grant a motion for default judgment is "left to the [court's] sound discretion." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999); *Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 606 (E.D.N.Y. 2017). "A district court need not agree that the alleged facts constitute a valid cause of action," *Mickalis Pawn Shop*, 645 F.3d at 128 (internal quotation and citation omitted), and the court therefore must "determine whether [the plaintiff's] allegations establish [the defendant's] liability as a matter of law," *Finkel*, 577 F.3d at 84.

## II.    The Breach of Contract Claims

To succeed on a breach of contract claim, a complaint must sufficiently allege "'the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.'" *Salameno v. Rawlings*, No. 19 Civ. 4442 (PGG) (BCM), 2021 U.S. Dist. LEXIS 53454, at *38 (S.D.N.Y. Mar. 22, 2021) (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)), *adopting* 2020 U.S. Dist. LEXIS 171552 (Sept. 17, 2020). "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 31 (2d Cir. 2018).

Of critical importance here, a plaintiff must adequately allege that the parties agreed to the material terms of the contract. *See e.g., Benicorp Ins. Co. v. Nat'l Med. Health Card Sys*., 447 F.

6

Supp. 2d 329, 337 (S.D.N.Y. 2006) ("[t]he fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract."); *see also Tractebel Energy Marking, Inc. v. AEP Power Mktg., Inc*., 487 F.3d 89, 95 (2d Cir. 2007); *CAC Grp., Inc. v. Maxim Grp., LLC*, No. 12 Civ. 5901 (KBF), 2012 U.S Dist. LEXIS 148062, at *3 (S.D.N.Y. Oct. 10, 2012) ("the existence of the agreement is dependent upon allegations demonstrating, *inter alia*, the parties' mutual assent to the terms of the agreement."). "A material term is any term properly bearing upon the subject matter of the contract." *Shann v. Dunk*, 84 F.3d 73, n. 3 (2d Cir. 1996); *see also Reliable Automatic Sprinkler Co. v. Sunbelt Grp. L.P.*, 472 F. Supp. 3d 64, 73 (S.D.N.Y. 2020) ("[e]xamples of material terms include subject matter, price, payment terms, quantity, timing, compensation, and duration."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015) (quoting 17A Am. Jur. 2d *Contracts* § 190 (2015)) (a material term includes "subject matter, price, payment terms, quantity, duration, compensation, and the dates of delivery and production, so that the promises and performance to be rendered by each party are reasonably certain.")

"A plaintiff must do more than 'state in a conclusory manner [that] an agreement was breached.'" *George & Co., LLC v. Spin Master Corp*., 2020 U.S. Dist. LEXIS 223689, at *12 (E.D.N.Y. Nov. 30, 2021) (quoting *Berman*, 580 F. Supp. 2d at 202). Therefore, "a claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal." *Full Circle United, LLC v. Skee-Ball*, *Inc*., No. 11-CV-5476 (LB), 2014 U.S Dist. LEXIS 202841, at *14 (E.D.N.Y. May 13, 2014) (quoting *Berman*, 580 F. Supp. 2d at 202).

As an initial matter, although the EUL Parties bring three separate breach of contract claims, (EUL Compl. at 11-14; Countercl. at 31-34)[4] at best they specifically allege the existence of only two agreements: 1) a financial agreement, in which the EUL Parties invested money in return for a share of the profits from the investment vehicles under specific payment terms (EUL Compl. ¶¶ 12-14, 69; Countercl. at 20-21); and 2) a storage agreement (EUL Compl. at 13-14; Countercl. at 25). Each of these purported agreements are addressed in turn.

A.  The Financial Agreement

1.  The EUL Parties Fail to Sufficiently Allege That A Contact Existed

The EUL Parties allege that they invested money in the Global Parties' car inventory in exchange for sixty percent of the profits on sales of the investment vehicles. (EUL Compl. ¶¶ 12-14, 69). Under the "agreement" the EUL Parties would receive back "1.5% per month [of their investment] as an advance payment" toward their sixty percent profit share, with the remainder of the sixty percent to paid the year following the car sales. (EUL Compl. ¶ 12). The Complaint does not state how this agreement was made—whether orally or in writing—and provides no facts whatsoever to suggest that the Global Parties agreed to be bound by this alleged profit-sharing

---

[4] The EUL Parties improperly attempt to dissect this agreement into three separate agreements and causes of action: (1) an investment agreement; (2) a profit-sharing agreement; and (3) a storage agreement. (EUL Compl. at 11-14). In the Counterclaim, the causes of action are labeled: (1) principal amount due under investment agreement; (2) profit sharing for 543 vehicles; and (3) storage charges. (EUL Countercl. at 31-34). The facts as alleged, however, suggest the existence of a single agreement, if any existed at all. *First*, throughout the Complaint, the EUL Parties allege that "*an* agreement" existed between the parties. "An" is a "singular adjective" which describes a "separate person or thing" or "denote[es] one person, thing or instance." The agreement, described above, is always described in singular form. Additionally, the facts giving rise to the "investment" and "profit sharing" causes of action are all set forth in the same section of the Complaint, conveniently titled "The Agreement." (*Id*. at 3). This suggests that there was only one unified, inseparable agreement. *Second*, the EUL Parties do not allege that there was an offer, acceptance, and consideration for both the "investment agreement" and the "profit sharing agreement." Instead, the EUL Parties claim that the investment served as consideration *for* the profit-sharing agreement. (*See id*. ¶ 12 (the parties "entered into an agreement pursuant to which Empire would invest certain funds in a vehicle inventory *in exchange* for a share in any profits on the re-sale of the vehicles . . .")) (emphasis added); *see also Rojo v. Deutsche Bank*, No. 06 Civ. 13574 (LBS) 2008 U.S. Dist. LEXIS 94007, at *11 (S.D.N.Y. Nov. 5, 2008), *aff'd by* 487 F. App'x 586 (2d Cir. 2012) ("[c]onsideration is a bargained-for exchange of promises or performance.") Accordingly, the terms are indivisible from each other.

agreement.[5] *See Full Circle United,* 2014 U.S Dist. LEXIS 202841, at *14 (quoting *Berman*, 580 F. Supp. 2d at 202) ("a claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal.") The EUL Parties offer only conclusory allegations that, in exchange for their investment, the Global Parties agreed to pay the EUL Parties sixty percent of the profits from the sale of the investment vehicles. (EUL Compl. ¶¶ 12-13). Accordingly, the Complaint fails to sufficiently allege that the Global Parties assented to the profit sharing agreement or its specific payment terms, which are material. *See Reliable Automatic Sprinkler Co.*, 472 F. Supp. 3d at 64.

Although a motion for default judgment requires the court to accept all well-pleaded allegations as true, an allegation is not well-pleaded if it is contradicted by the parties' own pleadings and submissions in support of default judgment. *Getty Images (US) Inc. v. Advernet, Inc.*, 797 F. Supp. 2d 399, 439 (S.D.N.Y. 2011) ("Allegations are not well pleaded 'which are contrary to uncontroverted material in the file of the case.'") (quoting *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)); *see also Western Heritage Ins. Co. v. Jacobs Dev. Corp.*, No. 12 CV 5718, 2014 WL 297792, at *7 (E.D.N.Y. Jan. 27, 2014) (citing *Getty Images*, 797 F. Supp. 2d at 414) (denying a motion for default judgment where the allegations were not well-pleaded because they were contradicted by plaintiff's evidence); *Montblanc-Simplo GmbH v. Colibri Corp.*, 739 F. Supp. 2d 143, 151 (E.D.N.Y. 2010) (explaining

---

[5] EUL has not provided a copy of a written agreement, nor any writings or other communications suggesting that the Global Parties agreed to this provision. EUL claims that "[o]n or about February 6, 2013, defendant Kapustina wrote to Empire in response to Empire's demand for payment in full, and admitted Empire's equity interest in the Inventory vehicles." (*Id.* ¶ 27). EUL only provides an email from February 7, 2013, from defendant Kapustina to Hitrinov. (Case No. 13-CV-2479, Dkt. No. 14-12). Assuming this is the writing EUL references in the Complaint, the only possible innuendo to profit-sharing in this email, which was translated from Russian, is: "[y]ou have decided that you no longer want to have an ownership in the cars inventory. Ok." (*Id.*) At best, this reference to profit-sharing is ambiguous. "To have" could mean that EUL possessed a current interest in the inventory, or that EUL wished to have an interest in the future. Either way, this sentence certainly is not an "admission," as EUL claims (*id.*), by the Global Parties that EUL had a 60% profit-sharing interest in the inventory.

that even if allegations in complaint are sufficient to establish liability, they are no longer considered well-pleaded if the plaintiff provides evidence that contradicts the allegations); *In re Wildlife Ctr., Inc.*, 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989) (explaining that on motion for entry of default judgment allegations of fact in complaint lose their conclusive effect if proof offered by plaintiff demonstrates that they are false). Here, the allegation of the existence of a mutual agreement between the parties is contradicted by EUL's own Complaint and other documents in the record,[6] and cannot be accepted as true. In the Complaint, EUL states that "[a]pproximately one-year into the parties' performance of the agreement . . . the parties increasingly *disagreed on* vehicle valuations; *whether Global had an actual interest in the vehicles offered for the vehicle [i]nventory;* and, whether Global was trying to bypass the possessory interest that Empire had in the [i]nvestory vehicles." (*Id*. ¶ 21) (emphasis added). The absence of any factual or evidentiary support in the EUL Parties' numerous submissions that the Global Parties assented to the payment terms of the agreement, coupled with this allegation that the parties *disagreed* on a material term – EUL's purported sixty percent security interest -- supports the inference that the Global Parties never assented to such any agreement. Accordingly, the EUL Parties have failed to satisfy their burden of sufficiently alleging that the Global Parties agreed to all the material terms of the contract, and, therefore, has not alleged that an enforceable agreement existed.

---

[6] The existence of a sixty/forty profit-sharing agreement is contradicted by testimony Kapustin gave at a deposition taken by EUL's former attorney, which is on the docket in support of the New Jersey Plaintiff's Motion in Opposition to Default Judgment. (*See* Case No. 14-CV-2479, Dkt. No. 147-6 at 244:6-245:3). At his deposition, Mr. Kapustin attested that the Global Parties "did not have any written agreements with [the EUL Parties]." (*Id*. at 244:6-7). Kapustin describes the arrangement not as a profit-sharing scheme, but as a loan repayment program, in which he would be given a "credit" towards Plaintiff's investment, and that Hitrinov would "without [] any warning[] change the interest rate" from thirty/seventy, to sixty/forty to fifty/fifty. (*Id*. at 244:11-25). This corroborates Plaintiff's allegation in the Complaint that there was disagreement about the profit-sharing amount, and further supports the inference that there had been no "meeting of the minds" between the parties of the material terms of any agreement.

2.  The Alleged Agreement is Unenforceable
    Under the New York Statute of Frauds

Further, even if EUL could prove that the parties assented to the material terms of the agreement and that a valid contract existed, the agreement would be unenforceable under the New York Statute of Frauds. Under the statute, a contract that "by its terms is not to be performed within one year from the making thereof" is unenforceable unless it is memorialized in writing. N.Y. Gen. Oblig. Law § 5-701(a)(1); *see also Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007).

The Statute of Frauds is an affirmative defense, Fed. R. Civ. P. 8(c)(1), and "courts are split on how to handle a default judgment motion on a contract when the Statute of Frauds looms as a potential barrier to recovery." *Chesapeake Bay Diving, Inc. v. Delta Demolition Grp*., Inc., 2014 U.S. Dist. LEXIS 172957, at *7 (E.D. Va. Dec. 12, 2014) (summarizing cases). Federal courts in New York have denied motions for default judgment when the pleadings failed to establish that an agreement, which by its terms would fall under the Statute of Frauds, did not meet the statute's requirements. *See Gabr Int'l Trading Corp. v. Birdsall*, No. 07-CV-4310 (ARR) (SMG), 2009 U.S. Dist. LEXIS 129814, at * (E.D.N.Y. Feb. 12, 2009), *adopted by* 2009 U.S. Dist. LEXIS 125507 (Mar. 4, 2009) (denying default judgment on a breach of contract claim where the plaintiff could not establish the existence of a valid contract because the agreement could not be completed within one year and the pleadings failed to establish that the agreement was in writing); *Messer v. TX Onshore, LLC*, 509 B.R. 791, 805 (Bankr. S.D.N.Y. 2014) ("in order for the implied-in fact contract to be enforceable, the Plaintiff is required to satisfy the Statute of Frauds by pleading that a writing exists); *Barbosa v. Jastrzab*, No. 08-CV-857 (FJS) (RFT), 2009 U.S. Dist. LEXIS 26323, at *7 (N.D.N.Y. Mar. 30, 2009) (denying default judgment because it was unclear from the pleadings

11

whether the alleged agreement could be completed within a year and, therefore, whether the agreement needed to be in writing).

Here, the Complaint establishes that the profit-sharing agreement could not be completed within one year, as "profits on the basis of the parties' respective equity interest . . . were to be distributed after a review of the sale of the vehicles *for the preceding year*." (EUL Compl. ¶ 14) (emphasis added). In other words, the material term of final payment of profits from the Global Parties to the EUL Parties would not occur within one year. Therefore, to satisfy the Statute of Frauds, the agreement needed to be in writing. N.Y. Gen. Oblig. Law § 5-701(a)(1).

EUL does not allege that the profit-sharing agreement was memorialized in writing, and the pleadings do not specify whether the original profit-sharing agreement was made orally or in writing. However, the supporting documentation, and EUL's failure to submit any written agreement, strongly suggest that the agreement was made orally.[7] Consequently, since the profit-sharing agreement was subject to the Statute of Frauds, and EUL has failed to set forth any facts to suggest that the agreement was memorialized in writing, it has failed to sufficiently allege the existence of an enforceable agreement. *See* Gabr, 2009 U.S. Dist. LEXIS 129814, at *6, *adopted by* 2009 U.S. Dist. LEXIS 125507 (Mar. 4, 2009); *Barbosa*, 2009 U.S. Dist. LEXIS 26323, at *7.

Accordingly, since the EUL Parties have failed to sufficiently allege that the EUL Parties and the Global Parties agreed to the payment terms, or that the agreement complied with the Statute of Frauds, they have not sufficiently pleaded the existence of a valid and enforceable contract. Consequently, it cannot succeed on a breach of contract claim. *Gabr*, 2009 U.S. Dist. LEXIS

---

[7] In his Declaration, Hitrinov attests that the profit-sharing agreement was agreed upon during a telephone call in September 2010. (Case No. 14-CV-2566, Dkt. No. 53 ("Hitrinov Decl.") ¶¶ 6-7). This corroborates Kapustin's deposition testimony that no written agreements existed between the parties. (*See* Case No. 13-CV-2479, Dkt. No. 147-6 at 244:6-245:3).

129814, at *6, *adopted by* 2009 U.S. Dist. LEXIS 125507 (Mar. 4, 2009); *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006). I therefore respectfully recommend that default judgment on this breach of contract claim be denied and the claim be dismissed.

B. <u>Storage Agreement</u>

The EUL Parties also bring a breach of contract claim for "storage charges." (EUL Compl. at 13). This claim has two parts. First, the EUL Parties allege that the Global Parties failed to pay storage fees related to the transportation and storage of vehicles between the United States and Europe (*Id*. ¶¶ 30; 79). Second, the EUL Parties claim that the Global Parties were required to pay additional storage fees after the Global Parties "failed to move" vehicles out of the New Jersey warehouse "on an expeditious basis." (*Id*. ¶ 80). This breach of contract fails claims for the same reason as the first.

First, the Complaint fails to sufficiently allege that the Global Parties agreed to pay the EUL Parties to store and transport the vehicles between the United States and Europe. The Complaint does not allege that there was an offer, acceptance, or consideration for any storage agreement. The EUL Parties make only the conclusory allegation that "[u]nder the parties' agreement,[8] Global was responsible for paying Empire all storage and handling charges for all vehicles entering the Elizabeth, NJ warehouse for ocean transportation to Finland" (*id*. ¶ 79) and that they are entitled to

---

[8] It is unclear whether the EUL Parties are alleging that the agreement to pay storage fees was part of the previously discussed financial agreement. Under the section of the Complaint labeled "The Agreement," the EUL Parties allege that "the parties agreed that Empire would be entitled to retain possession of any Inventory vehicle until the vehicle was released to a third-party with the consent of Empire" to "secure Empire's investment." (EUL Compl. ¶ 17). This suggests that there was not an agreement between the parties that the Global Parties would pay an additional fee to store and transport the cars, since the cars were held by the EUL Parties to retain their interest in the sale proceeds of the vehicles. Additionally, the section of Hitrinov's declaration that describes the financial agreement is devoid of any reference to a storage agreement. (*See* Hitrinov's Decl. at 2-3).

reimbursement for the storage fees the vehicles incurred in Europe (*id*. ¶ 30). The EUL Parties do not describe how or when this agreement was formed, do not allege the agreement's terms, and do not provide any evidence to indicate that the Global Parties implicitly or explicitly agreed to any storage and handling fees. Simply claiming that an agreement exists without proving its essential elements is insufficient to overcome the pleading standards in a motion for default judgment. *See Desarrolladora Farallon S. De R.L. De C.V. v. Cargill, Inc.*, No. 15 Civ. 532 (SAS), 2016 WL 1732754, at *5 (S.D.N.Y. Apr. 29, 2016) (granting motion to dismiss when plaintiff "merely assert[ed]" that an agreement existed without evidence of offer, acceptance, or consideration); *Schoninger v. Green*, No. 15 Civ. 2233 (PAC), 2018 WL 722838, at *3 (S.D.N.Y. Feb. 5, 2018) (finding no valid contract when parties have not manifested an intent to be bound). Accordingly, the EUL Parties' conclusory allegations are insufficient to meet their burden of establishing that an enforceable agreement existed.

Second, the EUL Parties allege that in December 2012, "Empire assessed *new* fees and storage charges on vehicles delivered to the [New Jersey] warehouse, mainly because of Global's failure to move these vehicles out of the warehouse on an expeditious basis and for effectively using the warehouse as a long-term storage facility." (*Id*. ¶ 27 (emphasis added)).  As an initial matter, the EUL Parties do not allege that there was any agreement that prevented the Global Parties from storing vehicles at the New Jersey warehouse for a prolonged period, or that the Global Parties would be charged storage fees if they exceeded this limit. To the contrary, the Complaint states that Empire would "retain possession of any [i]nventory vehicle until the vehicle was released to a third-party with the consent of Empire." (*Id*. ¶ 17). This suggests that, theoretically, the cars could be held at the facility indefinitely if the EUL Parties did not consent to their release, which is exactly what occurred here.

14

Even if such an agreement did exist, the EUL Parties' contention that "Empire assessed *new* fees and storage charges" (*Id*. ¶ 80) (emphasis added) indicates that the EUL Parties sought to modify whatever agreement had existed. To be valid, a contract modification must satisfy each element of contract formation, including offer, acceptance, and consideration. *Reyes v. Lincoln Auto. Fin. Servs*., 861 F.3d 51, 57 (2d Cir. 2017); *Beacon Terminal Corp. v. Chemprene, Inc*., 75 A.D.2d 350, 354 (N.Y. App. Div. 2nd Dep't 1980)). A party seeking to enforce an oral modification to a contract must provide "some proof of consideration . . . for the modification to be valid." *Dumolo v. Dumolo*, No. 17-CV-7294 (KAM) (CLP), 2019 U.S. Dist. LEXIS 50500, at *11 (E.D.N.Y. Mar. 26, 2019) (denying default judgment when a party could not provide proof of consideration of an oral modification). A party may, however, evince unambiguous assent to the modified contract terms through a user's continued use of an account after the user receives notice of the revised contractual terms. *Zachman v. Hudson*, No. 20 Civ. 1579 (VB), 2021 U.S. Dist. LEXIS 53322, at *12 (S.D.N.Y. Mar. 22, 2021).

Here, the EUL Parties do not allege any facts to support an inference that the Global Parties either explicitly or implicitly assented to the new storage fees. Although the Global Parties continued to store the vehicles at the New Jersey facility after they were notified of the new charges in December 2012, (EUL Compl. ¶ 28), this was not by choice. In a February 2013 email, translated from Russian, Kapustina asked Plaintiffs to "release the cars." (*Id*.) The EUL Parties refused, which caused the Global Parties to file the original lawsuit seeking an immediate return of the vehicles. (Hitrinov Decl. ¶ 33). Accordingly, the EUL Parties cannot argue that the forced storage of the vehicles at the warehouse evinced the Global Parties' consent to the storage charges.

Since the EUL Complaint is completely void of any details supporting the formation of a enforceable storage agreement, I respectfully recommend that default judgment on this breach of contract claim be denied and that the claim be dismissed.

III.    Libel Per Se

The EUL Parties also bring a claim for libel per se. (EUL Compl. at 16). To succeed on a libel per se claim, a plaintiff must show: "(1) a written defamatory statement[9] of fact concerning the plaintiff; (2) publication to a third party; (3) fault, either negligence or actual malice depending on the status of the libeled party[10]; (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)."[11] *Celle v. Filipino Rep. Enter., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Further, the defamatory statement must "tend to injure another in his or her trade, business, or profession." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 290 (S.D.N.Y. 2016).

Here, the EUL Parties allege that "on or about March 12, 2013, Global, through the Individual Defendants, purchased and registered, or caused to be purchased and registered,

---

[9] "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, 2021 U.S. Dist. LEXIS 102800, at *26 (S.D.N.Y. June 1, 2021) (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012)). A defamatory statement is a false statement that "tends to expose the p[erson] to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking person, and to deprive him of their friendly intercourse in society." *Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407, 411 (N.Y. App. Div. 1st Dep't 2009) (quoting *Rinaldi v. Holt, Rinehart & Winston*, 42 NY2d 369, 366 (1977) *cert denied* 434 U.S. 969 (1977)).

[10] To succeed on a libel claim, a private individual, such as Hitrinov, does not need to prove actual malice. *Wallace v. Weiss*, 82 Misc. 2d 1053, 1056 (N.Y. Sup. Ct., Monroe Cnty. 1975) (citing *Gertz v. Robert Welch*, 418 U.S. 323 (1974)). Private figures are only subject to a negligence standard. *Coleman v. Grand*, No. 18-CV-5663 (ENV) (RLM) 2021 U.S. Dist. LEXIS 37131, at * 12 (E.D.N.Y. Feb. 22, 2021). However, in the absence of showing actual malice, private individuals are limited to compensation for actual injury. *Wallace*, 82 Misc. 2d at 1056.

[11] A statement accusing someone "of a serious crime is defamatory per se." *Brandenburg*, 2021 U.S. Dist. LEXIS 102800, at *26 (citing *Oakley v. Dolan*, 833 F. App'x 896, 900 (2d Cir. 2020)). A crime is "serious" for the purposes of defamation if it is punishable by imprisonment or is "regarded by public opinion as involving moral turpitude." *Conti v. Doe*, No. 17 Civ. 9268 (VEC), 2019 U.S. Dist. LEXIS 31408, 2019 WL 952281, at *7 (S.D.N.Y. Feb. 27, 2019).

individual and unique web addresses under various domain names for the sole purpose of damaging Hitrinov, interfering with [his] commercial dealings with third parties and defaming Hitrinov and damaging his reputation."[12] (EUL Compl. ¶ 38; *see also* ¶ 109). These websites described Hitrinov as "the most ingenious crook of all time," a "racketeer," and a "large-scale money-launderer" and stated that EUL is a "scam" and "rouge enterprise." (*See id*. ¶¶ 104; Case No. 13-CV-2479, Dkt. No. 138-18). EUL asserts that these statements are false, (*id*. ¶ 105), and that the Global Parties "knew or should have known that the defamatory statements were false." (*Id.* ¶ 106). In February and March 2013, the Global Parties also allegedly sent e-mails to known EUL clients containing additional falsehoods about the EUL Parties. (*Id*. ¶¶ 32-34; Hitrinov Decl. ¶¶ 55-56).[13] The EUL Parties allege that these statements caused Hitrinov's reputation to be "seriously injured" and caused monetary damages.[14] (EUL Compl. ¶ 112).

Accordingly, the EUL Parties have sufficiently alleged libel per se. First, the Global Parties identified Hitrinov and EUL by name and accused Hitrinov of being a "crook" involved in financial

---

[12] "CPLR 3016(a) requires that, '[i]n an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally.' In this regard, New York courts require dismissal of a defamation claim where the persons to whom the defamatory remarks were allegedly made and the dates, times and places of the defamation are left unspecified." *Colon & Rectal Mgmt. Co. v. Garbus*, 2019 N.Y. Misc. LEXIS 11171, at *11 (N.Y. Sup. Ct. Nassau Cnty. Nov. 29, 2019). Here, the EUL Parties have sufficiently alleged the date the websites were created and the individuals who made the statements. Further, the EUL Parties submitted a copy of a deposition transcript from November 19, 2015. There, Kapustin admitted that he "created websites" but that the information in them was "truthful." (Case No. 13-CV-2479, Dkt. No. 138-19 at 210:6-25). However, Kapustin would not admit the names of the websites he created. However, the EUL Parties submitted the domain registration information for three of the sham websites. (Hitrinov Decl. ¶¶ 60–62). Each of the websites has Kapustin's or Kapustina's names in the billing and registrant information sections. (Hitrinov Decl. Ex. 26–28).

[13] Although copies of these emails are attached as exhibits (Case No. 13-CV-2479, Dkt. No. 138 Exs. 21-22) they are in Russian and no English translation is provided. Accordingly, the Court cannot determine the content of these emails.

[14] In his declaration, Hitrinov claims that the Global Parties' defamatory statements caused EUL to lose two accounts: AGA Export, Inc. ("AGA") and Caucasus Auto Import ("CAI"). (Hitrinov Decl. ¶¶ 68-69). The EUL Parties include a declaration from Alexandr Skory, the president of one of EUL's customers. (Case No. 14-CV-2566, Dkt. No. 52 ("Skory Declaration")). Skory states that after viewing the websites, he "formed doubts about EUL's integrity and reputation" and "as a result, [] decided to replace EUL with a different provider and gradually stopped placing business with EUL." (*Id*. at ¶ 7).

crimes (*Id*. ¶ 104). Second, these statements were published on a website that could be viewed by anyone in the world. (*Id*. ¶ 110). Third, the Global Parties accused the EUL Parties of being criminals involved in serious crimes, which are negligent statements, considering they can easily be proved false. *See Kesner v. Dow Jones & Co*., No. 20 Civ. 3454 (PAE), 2021 U.S. Dist. LEXIS 14358, at *56 (S.D.N.Y. Jan. 26, 2021) (holding that a publication's accusation that a plaintiff was a "bad actor" satisfied the negligence burden because the publisher did not investigate whether he was indeed a "bad actor"); *Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, No. 18 Civ 1736 (ER), 2019 U.S. Dist. LEXIS 45001 (S.D.N.Y. Mar. 19, 2019) (same). Fourth, the statements were, in fact, not true. (EUL Compl. ¶ 105). And finally, the statements accused the EUL Parties of committing serious crimes. (*Id*. ¶ 104). Such allegations are defamatory on their face. *Daniels v. Kostreva*, No. 15-CV-3141 (ARR) (LB), 2017 U.S. Dist. LEXIS 5534, at *23 (E.D.N.Y. Jan. 12, 2017) (holding that statements on a website that a plaintiff was a "crook" and involved in illegal activity were libel per se); *see also DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 114 (2d Cir. 2010) ("the defamatory statements 'impugn [plaintiff's] honesty, trustworthiness, dependability, and professional fitness and abilities by falsely charging her with conduct that would tend to injure [him] in [his] trade or business.").

Therefore, I respectfully recommend that default judgment for libel per se be granted.

IV.    Damages

"It is well established that a defendant's default constitutes the admission of all well-pleaded allegations in a complaint, except those pertaining to damages." *Daniels*, 2017 U.S. Dist. LEXIS 5534, at *30 (quoting *Transatlantic*, 109 F.3d at 111). Prior to awarding damages, a court must "ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec., Inc. v. Alcantar*a, 183 F.3d 151, 155 (2d Cir. 1999). To do this, the Court is not restricted to the four-

18

corners of the Complaint, and may consider other documentary evidence and testimony. *Daniels*, 2017 U.S. Dist. LEXIS 5534, at *30.

A. Compensatory Damages

There are two classes of compensatory damages for defamation: (1) general damages; and (2) special damages. *Wachs v. Winter*, 569 F. Supp. 1438, 1446 (E.D.N.Y. 1983). When, as alleged here, a statement is libelous per se, there is a presumption of general damages since the damages arise from the statement itself. *See Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 282 F. Supp. 2d 126, 132 (S.D.N.Y. 2003) (citing *Hinsdale v. Orange Cnty. Publ'ns, Inc.*, 17 N.Y.2d 284 (N.Y. 1966)); *Gallo v. Montauk Video*, 178 Misc. 2d 1069, 1070 (N.Y. App. Div. 2d Dep't 1998). General damages are compensatory in nature and do not need to be alleged  for the libel per se claim to be actionable. *Fischer v. OBG Cameron Banfill LLP*, 2010 U.S. Dist. LEXIS 101261, at *6 (S.D.N.Y. Sept. 24, 2010); *see also Boule v. Hutton*, 328 F. 3d 84, 94 (2d Cir. 2003). However, "[t]he presumption of general damages in libel per se cases does not mean that the court can award substantial damages without plaintiff having adduced any evidence." *Fischer*, 2010 U.S. Dist. LEXIS 101261, at *6. "The *amount* of damages will always be in issue . . . , and evidence must be introduced to demonstrate that the award should be more than nominal." *Davis v. Ross*, 107 F.R.D. 326, 330 (S.D.N.Y. 1985) (emphasis in original); *see also Technovate LLC v. Fanelli*, 2015 N.Y. Misc. LEXIS 3394, at *16 (N.Y. Civ. Ct., Richmond Cnty. 2015) ("[t]he amount of general damages in a defamation action must be supported by competent evidence concerning the injury.").

Special damages, on the other hand, are not presumed, and consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation[.]" *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 164 (E.D.N.Y. 2014); (quoting *Matherson v. Marchello*, 100 A.D.2d 233, 235 (2d Dep't 1984)). Special damages "must

be fully and accurately stated, with sufficient particularity to identify actual losses." *Eminah Props. LLC v. Energizer Holdings, Inc*., 2021 U.S. Dist. LEXIS 63646, at *29 (E.D.N.Y. Mar. 31, 2021) (quoting *Soter Techs., LLC v. IP Video Corp*., No. 20-CV-5007, 2021 U.S. Dist. LEXIS 36472, at *42 (S.D.N.Y. Feb. 26, 2021)). Finally, "if the special damage was a loss of customers . . . the persons who ceased to be customers, or who refused to purchase, must be named . . . if they are not named, no cause of action is stated." Enigma, 194 F. Supp. 3d at 292 (quoting *Drug Rsch. Corp*., 199 N.Y.S.2d 435, 441 (N.Y. 1960)).

Here, the EUL Parties have not sufficiently alleged special damages. In the Complaint, the EUL Parties do not identify any actual losses with particularity or name customers that ceased to do business with EUL as a result of the Global Parties' defamatory comments.[15] Accordingly, the EUL Parties are only entitled to recover general damages, which are presumed as part of their successful libel per se claim.

The EUL Parties allege that "[a]s a direct and proximate result of [the Global Parties' defamatory statements], Hitrinov's reputation has been seriously injured and has been damaged in an amount to be determined at trial, but believed to be in excess of $15 million." (EUL Compl. ¶ 112; Counterclaim ¶ 117). The Complaint, however, is void of any indication of how the EUL

---

[15] The only customer identified by name in the Complaint is the Mediterranean Shipping Co. ("MSC"). (EUL Compl. ¶ 32). The EUL Parties claim that their business relationship with MSC was affected by a letter the Global Parties sent to MSC, and not through one of the sham websites. (*Id*. ¶ 32). These allegations serve as the basis of the EUL Parties' tortious interference with a business contract claim (*see id.* at 15-16), and the EUL Parties are not seeking damages on this cause of action. (Default Judgment Mem. at 16). Even if the EUL Parties had properly named MSC in the libel per se cause of action, they still would not be entitled to special damages, because they do not state damages with particularity. They claim only that as a result of the letters, "there is a substantial risk that MSC will terminate the service contract and other commercial dealings with Empire." (EUL Compl. ¶ 99). They do not claim that the contract has actually ended, or that they have suffered economically in any way. Further, they claim that "Empire has suffered or will suffer damages in the amount of $15,000,000" (*id*. ¶ 100) but provide no basis whatsoever for this calculation.

Parties arrived at this amount and they have not provided the Court with evidence to support this request. *See Technovate*, 2015 N.Y. Misc. LEXIS 3394, at *16.

In support of their motion for default judgment, the EUL Parties have submitted declarations.[16] In his declaration, Hitrinov alleges that the defamatory statements caused EUL to lose business from two customers, AGA Export, Inc. ("AGA"), and Caucasus Auto Import ("CAI"). (Hitrinov Decl. ¶¶ 68-69). The EUL Parties include a declaration from Alexandr Skory, the president of AGA. (Skory Decl.). In his declaration, Skory states that after viewing the websites, he "formed doubts about EUL's integrity and reputation" and "as a result, [] decided to replace EUL with a different provider and gradually stopped placing business with EUL." (Skory Decl. ¶ 7). Although the EUL Parties do not submit documentation from a CAI representative, Hitrinov claims that the former head of logistics for the company verbally told him that CAI saw the sham websites, and were concerned that "there might be [] negative consequences from working with and/or being associated with EUL, which would reflect poorly on CAI and harm its own business and relationships. So . . . CAI decided to replace EUL with a different provider and gradually stopped business with EUL." (Hitrinov Decl. ¶¶ 70-71).

EUL acknowledges that business relationships lasted "at least three [] to five [] years" with both AGA and CAI, and that relationships with the companies would have lasted at least four more years if the defamatory statements were not published. (*Id.* ¶ 79). Based on this information, the

---

[16] Both Hitrinov and Skory submitted "affidavits" about business dealings with EUL since the publication of the defamatory statements. These statements were signed by the respective authors, dated, and declared under penalty of perjury but were not signed by a notary. Accordingly, they are more properly entitled "declarations." *See LeBoeuf, Lamb, Greene, & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d Cir. 1999) ("Section 1746 allows for the submission of an unsworn declaration to a court if it is subscribed by [the declarant], as true under penalty of perjury, and dated, in substantially the following form: . . . I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)") (quotations omitted) (quoting 28 U.S.C. § 1746)). Even though Skory's declaration does not contain the exact language of Section 1746, this declaration is still permissible as evidence. *See id.* at 66.

EUL Parties have estimated that they lost $2,436,050[17] in business from the companies. (*Id.* ¶ 80). The EUL Parties also provided spreadsheets showing the previous business dealings between EUL and the companies, which supports these calculations. (*See* EUL Dkt. No. 53-31 and 53-32; Compl. ¶¶ 74-80).

Courts in this Circuit have compensated plaintiffs with alleged reputational injuries based on lost or speculative earnings. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) ("[Plaintiff] was entitled to prove damages through a 'projection of lost profits based on evidence of record regarding decreased sales.'"); *Manswell v. Heavenly Miracle Acad. Services, Inc.*, No. 14-CV-7114 (MKB) (SMG), 2017 WL 9487194, at *20 (E.D.N.Y. Aug. 23, 2017) (awarding damages for defamation in a motion for default judgment based on plaintiff's previous and expected salary), *adopted by* 2017 WL 4075180 (Sept. 14, 2017). Accordingly, I respectfully recommend that the EUL Parties be awarded $2,436,050 in general damages, representing the lost profits for business with AGA and CAI.[18]

---

[17] AGA's lost profit of $237,600 and CAI's lost profit of $363,650 amounts to $601,250 for 2015. (*Id.* ¶ 78). To account for the remaining three years, the EUL Parties refer to their profits from AGA and CAI in 2011-2014, respectively, $247,500, and $364,100, totaling $611,600. (*Id.* ¶ 77). $611,600 X 3 years = $1,834,800. Therefore, the alleged lost profit from 2015-2018 is equal to $601,250 + $1,834,800, or $2,436,050.

[18] Hitrinov claims that "in addition to the quantifiable damages as the lost business . . . EUL and I have suffered additional harm in humiliation and damage to our professional reputation." (Hitrinov Decl. ¶ 81). Although damages related to humiliation and loss of professional reputation are not required to be pleaded specifically when a party has proved libel per se, the party seeking damages must provide some basis for a monetary award. *See Davis v. Ross*, 107 F.R.D. 326, 330 (S.D.N.Y. 1985); *Rupert v. Sellers*, 65 A.D.2d 473, 482 (N.Y. App. Div. 4th Dep't 1978). The EUL Parties provided no support or any reasoning whatsoever for their request of $12,563,950 in general damages for humiliation and reputational damage ($15,000,000 requested damages amount – $2,436,050 compensation damages = $12,563,950 in remaining requested damages). Accordingly, the Court cannot award damages without some kind of evidence that the EUL Parties are entitled to these damages. *See,* 107 F.R.D. at 330; *Rupert*, 65 A.D.2d at 482.

B. Punitive Damages[19]

The EUL Parties also request punitive damages because the Global Parties "knew [] the defamatory statements and actions were false and because they were made maliciously." (Compl. ¶ 113). "Punitive damages may only be assessed under New York law if the plaintiff has established common law malice[20] in addition to the other elements of libel." *Celle*, 209 F.3d at 184 (citing *Prozeralik v. Cap. Cities Communications*, 82 N.Y.2d 466 (N.Y. 1993)).

"To show common law malice, a plaintiff must prove that the defendant was motivated '*only*' by 'spite or ill will.'" *Conti v. Doe*, 2021 U.S. Dist. LEXIS 77765, at *33 (S.D.N.Y. Apr. 22, 2021) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38 (N.Y. 1992) (emphasis added)). Common law malice "focuses on the defendant's attitude toward the plaintiff." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000). "Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote." *Celle*, 209 F.3d at 184 (citing *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) ("any competent evidence, either direct or circumstantial, can be resorted to [to establish common law malice], and all the relevant

---

[19] Admittedly, "the law as to whether punitive damages can be awarded in cases decided by default judgement is somewhat murky." *Robertson v. Doe*, 2009 U.S. Dist. LEXIS 138932, at *33 (S.D.N.Y. 2010), *rejected on other grounds by* 2010 U.S. Dist. LEXIS 151305 (May 11, 2010). Under *Dubai Bank*, the court held that punitive damages should not be awarded in default judgment cases because "there has been no trial of the facts" and the defendant's state of mind necessary to determine malice could not be proven. *See Robertson*, 2009 U.S. Dist. LEXIS 138932 (citing *Dubai Bank, Ltd. v. Joshi*, 1989 U.S. Dist. LEXIS 16248, at *13-14 (S.D.N.Y. Aug. 29, 1989)). However, in *Dubai*, the court also recognized that a "plaintiff should not be penalized because he was won judgment by default rather than by a trail on the merits." *Id.* at 17.

[20] It is important to note the difference between common law malice, which a plaintiff is required to show to recover punitive damages in a libel action, and actual malice. Actual malice focuses on an individual's attitude towards the truth of a statement, while common law malice focuses on a defendant's attitude towards the plaintiff. Actual malice means that a defendant made a defamatory statement "with [a] high degree of awareness of [the publication's] probable falsity" or while "the defendant in fact entertained serious doubts as to the truth of [the] publication." *Konikoff*, 234 F.3d at 99 (quoting *Liberman*, 80 N.Y.2d at 438). Common-law malice, on the other hand, means that a speaker's motivation for making a statement was only spite or ill-will towards the defamed individual. *Id.*

circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, [and] ill will, or hostility between the parties").

Here, the EUL Parties seem to confuse actual malice, which focuses on a speaker's regard for the truth, with common-law malice, which focuses on the speaker's regard for the defamed party. *Konikoff,* 234 F.3d at 99. The EUL Parties allege that the Global Parties "knew or should have known that the defamatory statements were false." (Compl. ¶¶ 106). This allegation focuses on the truth of the defamatory statements, and not on the Global Parties' feelings towards Hitrinov and EUL.

Although the EUL Parties allege that Kapustin made the defamatory statements to "injure Hitrinov," (Compl. ¶ 111), they do not allege that this was his *only* motivation, as required to state a claim for common law malice. *Conti v. Doe*, 2021 U.S. Dist. LEXIS 77765, at *33 (S.D.N.Y. Apr. 22, 2021) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38 (N.Y. 1992)). Nor do they provide any evidence giving insight to Kapustin's state of mind or motivation at the time the defamatory comments were made. To the contrary, the EUL Parties submitted a deposition from Kapustin in which he claimed that he believed the statements he made on the website were true and accurate.[21] (Case No. 13-CV-2479, Dkt. No. 138-19 at 210:6-7). Accordingly, the EUL Parties' allegation that the defamatory statements were made with malice (Compl. ¶ 113) are conclusory and cannot be accepted. *See Ramsaran v. Abraham*, 2017 U.S. Dist. LEXIS 47751, at 15-16 (S.D.N.Y. Mar. 30, 2017) (holding that conclusory allegations regarding a defendant's malice were conclusory and could not be accepted as true on a motion to dismiss).

---

[21] Although Kapustin may have had a duty to investigate this information to ensure its truthfulness, the lack of truthfulness alone does not support a finding of common law negligence.

Ultimately, the Court cannot read the minds of the Global Parties or determine their true intentions for making the defamatory statements; it can only look at the pleadings to determine whether the EUL Parties have sufficiently alleged that the *only* possible reason that the Global Parties made the statements was due to ill-will towards the EUL Parties. The EUL Parties have failed to do so, and therefore, I respectfully recommend that their claim for punitive damages be denied.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that default judgment on the EUL Parties' breach of contract claims be denied and that such claims be dismissed; that default judgment on the libel per se claim be granted, and that the EUL Parties be awarded $2,436,050 in general damages to compensate the EUL Parties for the business they lost due to the Global Parties' libelous statements.

The EUL Parties' counsel is hereby directed to serve copies of this Report and Recommendation upon the Global Parties by regular and certified mail and to file proof of service with the Clerk of the Court. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Pamela K. Chen within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

RESPECTFULLY RECOMMENDED

___/s/ Ramon E. Reyes, Jr.___
Hon. Ramon E. Reyes, Jr., U.S.M.J.
Dated: August 20, 2021
          Brooklyn, New York